May I please record? Good morning, your honors. I guess my name is Anthony Yusey. I represent defendant, appellant Micha Terragna. And I guess I would like to proceed first. Given that there are four attorneys splitting up 20 minutes, and I believe one of the attorneys is representing two defendants, and so it may be that we each have five minutes, or it may be four minutes apiece. I want to make notes with that introduction, the time's up. I'd like to focus my argument on the first issue that I've raised on behalf of my client, Ms. Terragna, and that is with respect to what we say would justify this court in ordering a new trial on counts 1, 2, 3, 5, 6, 7, and 8, on which she was convicted for the reason we say that during the trial, evidence of slaveness attributed to her by government agents, and also physical evidence that was introduced during the trial, again, of which, according to government agents, she made comments on and explained, were introduced as part of the basis for her conviction. We say that that was error because those statements and evidence were obtained during an in-home interrogation of Ms. Terragna, pursuant to the execution of a search warrant, and we say that in the totality of the circumstances, she was subject to custody, and therefore entitled to Miranda warnings, which were not given. Was that because of the number of officers that were there? Yes, Your Honor. We rely on the United States Ninth Circuit case in Craighead, and in Craighead, the court articulated four non-exhaustive factors, the first of which was the number of law enforcement officers present at the time, and, in fact, the Craighead court did point out specifically that the larger the number, that goes a long way, and those are the words that the court used, to a conclusion that you had a police-dominated atmosphere, and the police-dominated atmosphere was what the Craighead court articulated as the new rule in its jurisdiction. It stated it as a benchmark for determining whether or not, in the context of an in-home interrogation, Miranda warnings should have been given. There were some statements which were suppressed, and I've distinguished for us which were which. The statements that were suppressed were statements attributed to Ms. Terragna's boyfriend, Kevin Bruin, who is the co-defendant in this case. When I say boyfriend, I mean, effectively, they were husband and wife. They had three… And later became husband and wife. And later became husband and wife. Correct. I mean, it was a serious, ongoing relationship with the family. It's not somebody who was just passing through. Exactly, Your Honor. And those statements were statements attributed to Defendant Bruin by the agents that were made at the outset of the execution of the search warrants when, well, when Defendant Bruin was in the driveway area being subject to a search of his person, because the warrants were two separate warrants, one for Ms. Terragna, one for Mr. Bruin. Both warrants were for the person and residence. And so it was only the statements made when they were searching his person that were suppressed? Correct, Your Honor. Okay. With respect to Ms. Terragna, the statements attributed to her were made later in the search after the protective sweep of the residence had occurred, and Ms. Terragna was in the house itself with her infant child. And at that time, evidence was being recovered by the search agents. And she was asked questions specifically with regard to… And she pointed at the money. Excuse me? She pointed at the money. Correct, Your Honor. She was asked about certain items, one of which was money that had been discovered. A second was a folder containing documentation with regard to the care and feeding of chickens. And the third of which was a diagram that was discovered. The diagram came into evidence as Exhibit 21. I think the folder came into evidence as Exhibit 22. I don't think the money itself came into evidence, but it was referred to during the trial. We, of course, relied on Crayhead. And what I'd like to do is I think point out things that were present in Ms. Terragna's case which were, I think, referred to but maybe not emphasized as well as should have been in my brief, that were not present in Mr. Crayhead's case, and which, I think, goes a long way to a conclusion that if the Crayhead decision ruled that the money should have been given in his case, then certainly it should have been given in Ms. Terragna's case. And that is that, first of all, in Ms. Terragna's case, what we had was a search of not just the residence, but a search of the person. Crayhead was just a search of the residence, not of Mr. Crayhead himself. Crayhead was not searched. Ms. Terragna was searched. At the beginning, out in the front yard, in open view of her neighbors, she was subject to, according to the agent, at least a visual search of her physical body. And we'll say, and the agent admits, probably with the lifting of her shirt to look at her waistline. So she was physically searched. Also present in her case. How does that make a difference after the search is over? The ultimate issue is whether she's infested. Right. She's searched, presumably to make sure she doesn't have a firearm. After the search is over, what difference does that make? This is the difference that it makes, Your Honor. At that point, there's no question that she's being detained. There's no question. And even the district court acknowledged that. She's being detained. What we say is to meet at what point in time? At the outset of the execution of the... So you're making this argument to let us know that any interrogation that ensued was custodial. Correct. See, I said that. I'm a slow talker. Right. You look like Kirk Douglas to me. You're not the gladiator. No, Your Honor. But as to Judge Clifton's question, she was detained. And she was detained through the search. But the finding of the district court was that the officers made it clear that they were not detained, that they were free to go once that search of the person had been accomplished. Well, that, I think, given the evidence and all inferences in favor of the government, the evidence on that came through the search team leader, which was FBI agent Michael McDonald. And he was vague with respect to what he told both these defendants with respect to whether they could leave or not. He said the exact words used, but I know that he was vague as to the concept. Right. What the Crayhead decision states also is it's not the fact that the defendant may have been told that he or she was free to leave. It's what the defendant reasonably felt under the totality of the circumstances. And what I'm saying with respect to the significance of the fact that you had a detention, even if it was at the beginning, you had a detention. And the Crayhead decision does say, as a second factor, that the defendant deemed free to leave. Well, it does say it's saying free to leave. Where does that all get you? Well, that gets us to the third point, because now we have a large number of police officers, which goes a long way to indicating custody. We have a detention, the second point. The third point is isolation. Ms. Twain was there with her infant child. There was no other family member. No other family member. But what statements would then be suppressed or suppressed? Now, the statements that would be suppressed would be the absence she gave to a primary agent, with respect to identifying number one, exhibit 21, which was the diagram of the chicken fight site, and also explaining in detail what the significance of that diagram was. I mean, that the government went into both in its opening and rebuttal argument and also in the way it was said. So you're saying without that, she would not have been convicted? Well, Your Honor, she was acquitted of one count, conspiracy count. What I'm saying is that without the evidence of her statements that were attributed to her, tying her to the gangland operation, I'm saying that I don't believe that anyone can say that a jury would necessarily have convicted her of any of these counts. If she had volunteered quite a few statements, then those should not be suppressed, I would assume. Your Honor, I don't believe, well, the statements may have been voluntary in the sense that when she was asked to explain these items of evidence, she gave an answer. Well, when she asked, the district court's finding is nor is there any evidence that McDonald or any agent asked her anything. Now, Your Honor, the trial transcript differs because in the trial transcript, Agent McDonald is asked by the government specifically with respect to Exhibit 21, the diagram, and Exhibit 22, the favor, first whether he could identify this and he does, and he then asks the agent, what did Ms. Thurignan say about these items? And the detective, the agent, I'm sorry, Agent McDonald says, I asked her basically to explain what these things were, to identify them and to explain them. So these items of evidence are being recovered by the search team. They're brought to Agent McDonald. He has them. He then asks Ms. Thurignan, what are these things? Explain to me what they are. So she is being questioned. She is being interrogated. She is being asked questions by the agent. And we say that in the context... It was a sketch of the arena, right? Correct. Correct. Correct. And used by the government very effectively, both in its opening, during the trial, with a questioning by the agent, and then it was used by the government. Your coat pants are getting very nervy. Right. Just a couple more points. She was never told that her questioning would be voluntary. Craighead himself was told that his questioning would be voluntary. Craighead's search began at 8.40 a.m. in the morning. Her search began at 6.05 in the evening. I mean, it was more likely for Craighead to be able to leave at that time than for her to leave her house in the evening when she had nowhere to go. She was there with her children, confronted by eight armed male agents. Craighead penalized them, just himself, to care about. Craighead specifically chose, and this is at the end of the Craighead bit, he specifically chose to remain because he was concerned about his personal belongings and he was concerned about his... We really understand your argument. Thank you. May I please report? Richard N. Wetterbeam for defendant Kevin Broome. I won't be able to be with Craighead's argument any further. Defendant Broome, Appellant Broome, believes that all statements should have been suppressed under the Craighead analysis that's fully briefed in this matter. Well, your client is or was a policeman. Yes. I think he understood Miranda and understood all of those issues. So for him to claim that these should be suppressed because he didn't get the warnings isn't the best argument in the world, at least from my sense of it. Well, I think that just because he's a police officer doesn't deprive him of his rights to Miranda protections. He was probably right, except that we would think that he would know it was right. It's good he never learned. Well, he's, who knows? I'm not going to blame him. He was dazed, huh? Yes. But he also had his Assistant Chief of the Homeland Peace Department participate during that search and pull them over on the side and for him to cooperate with the warrant. And we would submit that it would certainly be something that, in following the orders of his superior who was present at that time, something that he really had no option in doing one way or the other. The court did suppress certain statements because, and although we believe that it should have suppressed all statements, those statements we submit were statements that were substantially prejudicial that were allowed in a trial that should have been suppressed. They were effectively used by the government in its argument in closing. And, again, I think that we were substantially prejudiced by the court not drawing a line as to which statement should have been let in or not let in. It didn't go through that exercise and argument. Was your client arguing any braving violations? We did join in with that argument with court counsel or court attendance counsel in this matter. We also believe that materials as requested should have been produced. We also argued in this matter, of course, that the indictment should have been dismissed pre-trial, that things like nonperformance of duty, which was articulated in the indictment, we had absolutely no idea what that consisted of. In fact, we will submit that the evidence showed that, in fact, the defendant did not have these type of duties that were articulated by the government or were tried to argue by the government during trial. Another matter, of course, was Batson. The Batson argument that we also joined in with court attendance counsel on. We believe that we... Okay. Very well. We're going to extend all those arguments. Thank you. Thank you. Next. Good morning, Your Honor. My name is Pam Tomaschero. I represent Douglas Gilman Sr. Appellant. I'd like to focus my attention on the late filing that I filed yesterday. I hope the court received it when I informed the court that I was going to rely on the United States v. Seeger case, which came out on May 4th, 2010. Is the court aware of that filing, which was filed yesterday? I haven't seen it. I do have copies of both the filing and the case. I think we got it, the 28-J that you filed yesterday. Correct. Yes. Okay. What we're complaining about in this case is that... I was on scene duty then. Oh. And I'm sure that it'll be there for him. You know, two of the government's main witnesses in this case were a Charles Gilman, who is my client, one of my clients' sons, and a John Sedivo. And, you know, during the course of the trial, in fact, on jury selection day, we find out definitively, or at least per a police report by the Honolulu Police Department, that they were using a confidential informant. And, you know, Mr. Aluli, on behalf of William Gilman, our co-defendant, had requested a Rule 16 disclosure of whether or not any informants were used in this particular case. And on the first day of jury trial, we get police reports which suggest that, indeed, the Honolulu Police Department was conducting a separate investigation of the Wailua chicken fight. But because on March 31, 2005, I guess, search warrants were executed on some police officers' homes, the HPD decided to close down their Wailua chicken fight investigation due to the conflict with the federal investigation, as well as the safety of an undercover officer and a confidential informant. Prior to this time, the defense had suspected that a confidential informant had been used, and that person would be John Sedivo, one of the government's critical witnesses. But we never got any information, despite the Rule 16 request, from the government about any confidential informant. Until the first day of jury selection, we asked the court for continuance, let help us digest this information, see where it fits in. The court denied the continuance at that point. And, in fact, so we went to opening statements without resolving this issue of whether a confidential informant had been used. And then throughout the trial, in addition to trying to try our case or, you know, defend our own case, we had to continually, much time and much effort was taken up in trying to get this information from the government about whether a confidential informant had been used. And finally, you know, I think it was about the fourth week of trial, because of our efforts, information kept dribbling in in the form of 302s of HPD officers. And, you know, the government may say that, you know, HPD, you know, we don't have control over those guys. But, in fact, the government adopted the HPD investigation and therefore became responsible as if it were a federal investigation, because at trial they used videotapes that were taken by HPD. They called HPD officers to testify about arrests that were made at the Wailua chicken fight. But on the first day of trial, after the jury had been selected, you know, the government has taken the position that there was no confidential informant. Come to find out, though, as these 302s keep trickling in, is that, indeed, on April 1, 2005, that's about one day after the search warrants of the HPD police officers occurred, an FBI agent, in a 302, interviewed a police officer by the name of Guy Mihaly, who said that John Sobibor was a documented source for me. And so the government knew as early as April 1, 2005, that there was a, maybe not a, whatever confidential source. Maybe not a source for this case. It was a source for this case. That's not what the 302 you read just told us. It said that Sobibor was a documented source for that officer. That doesn't necessarily make him a confidential informant for purposes of this case. But I believe the 302 says that Sobibor was providing information about drug dealing activities, as well as the chicken fights. It may not have been the Wailua chicken fight, because there was another chicken fight going on at Waianae. I guess the point is, and relying on Steve... Because the time is running, let me ask you to focus on what strikes me, what difference that would possibly have made in your submission. You tell us that it deprived your client of being able to submit a defense of entrapment. Correct. For the life of me, I have trouble figuring out how a defense of entrapment could possibly register here. The defense of entrapment is that, after all, the evidence showed that Sobibor made many phone calls, which were recorded, in which, for example, and also I would also point out in the 302s, there's also a blurb that says that Charles Gilman, in fact, was an undocumented source for HPD. So the difference that it would have made is that one, you know, I talked about a derivative of entrapment, which this court has frowned upon. To be generous, I still have trouble with the facts of this case finding any fit for the recording defense. What it is is that Misha Taragna had many telephone calls with Sobibor, and the evidence showed at trial that Misha actually never went to the chicken fights very often. But, you know, because there is a difference, an inference can be drawn that, I mean, Sobibor is the one who told Misha about trying to figure out how many chicken fights are going on. I mean, he kept, if I may use the word, inducing her to go down to the chicken fight, make his presence known, when, in fact, she had not been going down to the chicken fight. Where does that get your client at all? In that... I'm trying to figure out how could this informant have induced your client to be involved in the role, and I understand there are fights over the evidence, but he was found guilty. And this chicken fight was not launched because of what the informant is supposed to have done. I just don't see how the theory flows. Where's the entrapment? The entrapment is, if Misha was entrapped, perhaps the billmen would have had a derivative entrapment defense, because the law requires that... The chicken fight's there first. What they're convicted of is happening entirely independently of what the informant's supposed to have done. But, Judge, I guess, you know, without having the information or getting the information piecemeal during trial, I mean, you know, we were not able to look at whether, indeed, there was an entrapment defense, but I understand... See, the fact that you were unable to look doesn't matter if, in fact, there wouldn't have been an entrapment defense. On some level, you've got to establish your degree of prejudice. And, for lack of me, I just don't see how entrapment makes any sense in the context of these facts. If Misha was entrapped, then perhaps the Gilmans were derivatively entrapped because they were engaged in this enterprise. Is that not true? The Gilmans. Well, I mean, the jury so found. Well, the evidence is all over that they were engaging in chicken fighting. And so, I, like Judge Kristol, can't see how entrapment is going to be the defense, and maybe some others, but I guess... Entrapment doesn't get you anywhere anyway, either. The entrapment defense? Yeah. But aren't we entitled to get information that is... Well, that's what you ought to talk about. Well, that's what I'm talking about. But the reason for it is not an entrapment defense. No. We're entitled to the information. You're saying we're entitled to the information, we were entitled to get it timely, and we didn't get it. Well, no, I'm not saying... We did get it piecemeal. No, we didn't get it timely. Right. Okay. Right. And so we were not able to fully investigate where it might have led. But... It's important... I'm asking you another argument. I know. I was just going to focus on that as well. Well, is anybody going to talk about the Batson issue? Mr. Lillian Bolling is going to discuss that issue. Okay. All right. Thank you. And then there's the last guy here. The last guy standing. All right. So no one's really going to talk about these discoveries except you. May I speak to the court, Your Honor? May I speak to the court? Good morning. My name is Hayden Lillian. I represent two of the defendants, William Gilman, the younger brother of Pam's client, also the older brother, Doug Gilman, Jr. And if I may, I did give the clerk copies of my late supplemental citations. Just for you to review, may I speak to the court? What's going on yesterday? Oh, no. It's the court. Well, you give those clerks. That's what we got. The clerk doesn't... We already have it. All right. Thank you. A very efficient clerk. Yeah. Thank you very much, Your Honor. Well, I'm privileged to stand here to argue on behalf of two Gilmans who were found guilty by a jury. But in my view, their right to a fair trial has been compromised. And I've submitted five reasons why this court should reverse their conditions and grant a new trial. It's clear to me that the questions I want to focus on is whether or not the prosecution exercised its parenteral challenges in the battle of due process, basically Batson. We objected to three of the parenteral challenges that the government had used. Two of them were against persons of Filipino ancestry, and one was against a part Hawaiian. The Gilmans are part Hawaiian. This case involved cop fighting, which arguably was brought over from Southeast Asia, and it's a social event that is still practiced in Hawaii, as well as in the Philippines, which is legal, as well as other Southeastern Asian countries. Judge, you asked if the jury found the Gilmans guilty. Yes. But in the context of whether or not properly it constituted a federal offense, that is a question that I believe I've raised that the court should look at, whether or not the jury instructions were adequate, essential. But in one of these talks, did they wear blades on their... Yes. Yes, they do. What's so interesting, Your Honor, is when I submitted this supplemental citation, I came across a McLean v. 20, 10 years ago. Your Honor, you wrote that you were granted, well, you reversed the denial of a habeas corpus petition of a California case. That's one of my most famous cases. Thank you, Eugene. I got excited and I wanted to be sure to talk about that because the reasons why you found that the prosecutor violated the statute were a number of reasons that are applicable here. Number one, some of the reasons that the prosecutor gave were objectively contradictory facts. Two, a pretension upon conducting comparative analysis of the jurors that the prosecution left on the jury. And you stated that the prosecution's motives will be revealed as pretextual, where a given explanation is equally applicable to a juror of a different race who is not stricken. You said that basically it's a well-established tool for exploring the possibility that sexually-race-mutual reasons are a pretext for discrimination. You also noted that cases held in Prague, where there were fantastic justifications, may, and probably will, be found to be pretext for purposeful discrimination. And you also noted that where the facts in the record are objectively contrary to the prosecutor's statements and that one or more of the prosecutor's justifications do not hold up under judicial scrutiny, militates against the sufficiency of a valid reason. Now, getting to this case, we're all pretty familiar with all those concepts and factors. First, tell me, when you ended up, was there a diverse juror composition there? I didn't find in the record what the actual jury composition was when finally selected. Can you tell me, Pat? Unfortunately, there's nothing in the record as far as the juror cards or the final composition, and I apologize, but I don't think that is necessarily the pivotal role. You can't tell me that. I can't. So then, next, did you compare the jurors that were stricken, like the one who had two divorces, with someone comparable on the jury that was left on?  One of the jurors that the prosecutor left on, who also, likewise, did not have post-high school education, was a Randy Ganell, a state airport visitor information worker. Now, you know, the prosecutor bumped off Mr. Kohoge because basically he was like a hotel industry. He was under-educated. And also, the prosecutor claimed that having two divorces somehow would make him angry toward lawyers. And actually, you know, Ms. Randy Ganell, the prosecutor left on, arguably had some, I guess, I believe it was in the record that her husband passed, where she was a divorce, but she was left on. And she works at one of those criminal, criminal information juries. And what was her ethnic background? We don't have the cards, Your Honor, but her name is Randy Ganell. From my knowledge, she was Caucasian, Your Honor. So, I pointed out in my retired brief that the prosecutor left on five jurors who did not have post-high school education. Although, in the answer brief, the prosecutor made a big thing in before the issue of court that he wanted persons of higher education. And that, Justice Rick Perkins, it really underlines the government's claim that his reasons for exercising the right to challenge were not based upon race. Isn't there higher education? I mean, he was basically looking for a smarter juror. And he thought somebody who was working guest services at a hotel, with everything else, may not be the sharpest tool in the shed. That's true, but it's... But is that an improper basis for exercising a peremptory challenge? That may not be the way you compare him to a juror that he did leave on. Well, he ended up with somebody who told him he was a state airport visitor information worker. In fact, I wouldn't compare that very closely with a guest services person at a hotel. A guest service is a broad term, but usually that means some kind of maintenance or background position. Maybe a bellman, porter. Well, you know, Judge Perkins, you're from Hawaii. You know you go to Hawaii. I had a great chance of joining the judge in Hawaii, and you did. Well, you know, I mean, you don't find that funny. You end up with a choice. The first person you meet, you don't have a hut with a lake and all that. You don't have maps. I mean, that to me is probably not as sharp as a tool that somebody would service in hotels or restaurants. But to me, the process of reason was undermined when you comparatively look at the jurors that he left on. And so, I mean, if his reasons were, well, I don't want to say, maybe not exactly rational, what we're interested in, in the end, was was there a diverse jury that was selected and impaneled? And I don't see any proper real comparisons between the race of X and the race of Y. Well, Your Honor, I think that's a, that you can make a claim even when one juror is discriminated against based upon race. And that's all you need to show. I don't think the case law should say that even though you can exclude one or two, still we leave on a racially, you know, composite of the community. It's the fact that one person is denied his or her right to sit and perform social function because of his or her race. And we have presented this community. But you can't even tell us what the final composition of the jury was. I can't judge. You can't. I mean, it's a big deal. Do you think you'd know that? Well, Your Honor, I didn't put the juror cards in, and the juror cards are not in evidence. And in hindsight, I probably should have. And if the court would want the juror cards, which I do now have raised, I would ask the court, the legal court, to submit the juror cards that were part of the jury minutes. Well, what do the juror cards say? The juror cards, in my experience, have some type of Lincoln-type issues, Caucasian or Hawaiian or whatever. So I believe so. That's what you want me to remember. But, Judge, it seems to me that when you compare the jurors that are left out and the reasons for the government's so-called race neutral, I think it is highly suspicious, at the very best. And just because someone comes to my area and Judge Clifton knows from Makapu'u all the way to Laikai, it's a big community. Some of you guys from there would be denouncing the right to sit on a jury because the prosecution made one gambling, cockfighting case, and then claiming that it's an area of high crime rate. There's nothing in the record about that. And claiming that because you were from that area and you've been divorced twice, that somehow you're going to be angry toward the rulers. I mean, I just think that is implausible. It's fantastic. It's not the kind of race-neutral reasons that this court should condone. And if I just may just talk briefly about the jury instructions that we believe that the court failed to do. First of all, we objected to one that seemed to capitalize all of the elements of the gambling statute into short paraphrases. We believe that that was in violation of engaging the promise of the jury. And secondly, the failure to give a specific admitting instruction as to five workers in 30 days and in addition about the affirmative defense of social gambling really constituted a plain error that prejudiced my client's rights and that a new trial should be granted. Well, did you argue that the jury understood this unanimity? I believe, Your Honor, that there was a plain error occurred by not giving a specific unanimity instruction itself outlined for the jury that they must all unanimously I think you're not answering my question. I, there's a general, there's a general unanimity instruction. Why did you argue, what did you argue with the jury about unanimity? I can't say that I can remember if I particularly addressed the needs for all, in fact I did it, that all 12 must find, all 12 must find each individual five persons, 12 plus each five. I never made that argument. But I guess you didn't tell the judge that he failed by not giving a full unanimity. I didn't, Your Honor, and that's why I'm asking the court in a plain error that the court had a duty to respond to, to protect my client's rights of due process and unanimity that it should have given on its own. How about the discovery issues? I think, Your Honor, one of my supplementary citations noted Lumpkin v. Bagley and I was really, Bagley v. Lumpkin, I was pretty much excited when I read the first case that came up, Your Honor wrote, but I didn't know that it was reversed by the Supreme Court two years later. Well, you should have anticipated that. I should have, and now I'm now. That last case should be, the history should be told, but I did follow it through this morning and when it came back down to you, Your Honor, all three of the judges affirmed that a new trial should be given. Simply because the Supreme Court reversed an automatic violation of Brady, but you found after going through all the evidence that the failure of the government to provide the evidence that the, what's called, impeachment material was sufficient to undermine the outcome of the trial. In this case, we believe that the defendants likewise were denied a fair trial and the outcome of this trial should be found to be undermined because we were denied the information upon which we could investigate and in which we could develop a possible defense. And I'm just pointing to the second dagger case that came down before you, Your Honor, that's 1986 case, 798 at second, 1297. You say that if disclosed and used effectively, the impeachment evidence may make the Davis Supreme Convention an accrual. Our task is to consider directly any adverse effect that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case and to assess that effect in light of the perpetrator's circumstances. That's one of my cases. That is your case. If you're my best customer. So get to specifics. What exactly, I mean, it's clear that everybody wants to be getting frustrated as this is unfolding and the information is coming out the way it was. And Judge Mulway is sitting there with the jury she's afraid of losing and so she's pushing the pieces back and forth. So get specific. What pieces did you not have sufficient time to pursue? What's going to have an impact here? Well, first off, there was not a subpoena to be taken in the middle of trial that finally pulled it out of the government's, you know, basket of evidence that John Segebo was the confidential source. Now, had we had the information way before trial, frankly, the strategy, the investigation would have been totally different. In fact, the defense could have been totally different. Let me extract. It's specific. I mean, because we talked about entrapment before. At least a couple of us expressed skepticism that they were going to fly. What else might have happened? Okay. I could say that if we needed to attack the credibility of those two witnesses, John Segebo and Charles Gilman, that the focus on undermining credibility would have started early on. We could have talked of subpoenas to the police officers that worked with Mr. Segebo to set up a situation where we could show the jury that you can't trust a word from John Segebo's mouth, knowing that he was playing two sides of the fence. And that's just unfair to have the government not give us that information so that we would go to trial now and have that inability. Okay. So you have some time between when you obtain the information and he gets cross-examined. What is it that you couldn't do in that context that you would have been able to do differently had the information come out earlier? Judge, I really... No, I understand it's a hard question, and it's a terrible way to conduct a trial. Absolutely. On the other hand, you know what the standard is, that there needs to be some kind of demonstration here of prejudice. And I'm just not sure that I have a good handle on what it was. I think to try a case where that information came out in the middle of trial, I'm talking on the fourth week of trial, we finally get a court order compelling the government to give us those information. That information is just, I think, contrary to all the fundamental fairness of a fair trial. You don't, frankly, go to trial and stand back and decide. That's what discovery is all about. And for all the reasons that I believe we're hampered from presenting, investigating, preparing, coming up with theories of defense, that's what it's all about. I mean, the government has a duty, right to do what's right, right to win, but not throw lobes over. You know, justice is done even if there is guilt or innocence, but it's the process that matters. Having the government not share that, as of April 1, 2005, when they knew by FBI 302 that this crucial witness was and it had information that we could use, is just against fundamental fairness. And we have to, based upon that and other four reasons, that a new trial be granted. Thank you very much. Okay. May it please the Court, good morning. Tom Miller from the United States. Let me first answer a question put by Judge Fletcher as to whether there was a determination of a diverse background on the jury. And we submit there was, made by the District Court Judge on page 136 of the October 29th transcript on page 136. At the bottom of page 136, the Court says, Okay, after this issue has been raised at Batson. The Court said, Okay. First of all, you know, when I look at this panel that exists, it's a multi-ethnic panel that is left. I cannot tell looking at them or looking at their names, some of them may well be of the very ancestry that you're concerned about. I cannot tell. I will also note that the ones in red are defense groups. The Court said, Well, they used red and black. And the Court said, Used red and black? Okay, okay. But it looks to me like some of the people, excuse me, who were stricken by the defense have surnames that could well be Filipino surnames, too, if I'm reading this list of stripes correctly. Rosaline, Mariosa, you know, it looks to me like some of the people could well have had Filipino ancestry also. So I hope that answered the Court's question about the multi-ethnicity of the panel. The other, and I can go and address each issue in particular, but I think it's more important I try to answer some of the questions that I understand. Well, I think what concerns me is the apparent failure of the government to provide discovery material and then hide behind the cloak of harmless error. Because I think the government has got an obligation to follow the law to the letter and to set a good example. So that's what concerns me in this case the most. Yes, let me try to answer the Court's question in that regard. We do admit that we inadvertently failed to give some discovery material as to How did you inadvertently? What do you mean inadvertently? Well, we did give discovery material back in what we call Giglio material on April 2008 as to Mr. Seguido, which detailed his criminal activity with drugs, his former or prior false statements, inconsistent statements to the FBI, his involvement with other drugs, steroids, and we provided that. There was, and what happened was we were keyed to the issue of infirmary employment that was raised, again, as Ms. Tomashiro says, that the first day of jury selection or the end of jury selection, the first day I guess it was, it was raised that there was a confidential informant by a police report at HPV. That was in the separate HPV device investigation that was done, and we explained that to the Court. The Court directed us to talk to that officer. We answered that. We called that officer. We took a recess. I think it was the next day, it was a recess, and we called the officer's supervisor, Mr. Larry Monowi, a retired policeman, and he verified that there was no CI involved in that case. John Seguido was not involved in that case. Then we went back, and we did go through our 302s and found that John Seguido had been mentioned in the FBI 302s in 2005. We turned those 302s over, the April 2005 302s, and we also had those officers re-interviewed by the FBI, and we turned those 302s over on April, excuse me, on November 3rd. We faxed those. I faxed those out the end of the day, at night, to all parties that had a fax machine and then provided them to one counsel the next morning, I believe it was. It may have been Mr. O'Leary. But we faxed them out, all those 302s. So we admit your Honor, we made a mistake. We didn't get those 302s out. We weren't keyed on the fact that John Seguido was a CI for the Honolulu Police Department for a separate individual, that is, a criminal intelligence unit officer by the name of Dave Brown. But, Your Honor, that fact that John Seguido was going to be an informant or a source of information for Dave Brown was mentioned by Mr. Wooderman on the day of the opening statement. So we remember some of this. What's your obligation when a request is made to unearth material that's with another agency? Because that happens all the time, doesn't it? It's our obligation to find out. Yes, it's your obligation to find out. The FBI reports refer to that individual in question.  So the FBI knew about it. Yes, Your Honor. But they didn't mention that to you? No, Your Honor. When we found it, that was our office that found it, went back, found it, and turned it over. And we admit it was not as timely, it was not given in advance, it should have been. We apologize for that. But we did give it, turn it over on the 3rd of November, and all parties were aware of it prior to the opening statement because Mr. Wooderman mentioned that. Mr. Wooderman had these 302s because he represented Mr. Breen on an administrative matter in a union capacity, I believe, before the police department. And Mr. Wooderman talks about that, I believe, in his brief. So we're correct. The court is correct. It's not timely. We should have been. But we also believe there's no prejudice. We submit there's no prejudice. The court found there's no prejudice. And, of course, that's a no-no review that this court does. But as far as I'm concerned, that's a lame excuse. I can only present to the court what's in the record and what we had and try to answer the court's questions. Counsel, I wanted to circle back to the Batson matter. The reasons for excluding some of the jurors seemed very weak and odd. And I guess the test is if you have improperly excluded one person on account of race, then you have Batson error. What did two divorces have to do with anything? We just thought perhaps. We've had argumentative jurors that have hung us up before, Your Honor. We were looking at the panel beyond that. We saw better jurors that we didn't have any issues with in that capacity. And, frankly, we were just looking for better jurors. Later on, we struck this gentleman or challenged this gentleman based upon the potential he could be argumentative, not like attorneys. Additionally, he was in the service industry, the hotel service industry. We were looking for a little bit sharper jury. As to that gentleman, I think we're talking about. Yes. Well, there seemed to be inconsistencies about the intelligence level of the jurors who took and the jurors who didn't. Well, there was some person. It's a factor that we raised on all different ones. There was one that we challenged. I was supposed. I was a lay believer. I was told that that person had more education. But the education that I looked at listening to that individual I thought was foreign education rather than in the United States, that that college may have actually been comparable to our high school. That was one juror we talked about. I can only try to answer the court's questions. I tried to answer them before the district court, and she found that the questions were race neutral and that nothing that she had seen, as she mentions on that page, 137, nothing she had witnessed caused her to question, and I hate to judge myself or argue about myself, but my integrity and my responses. And that's the way I have to try to answer the court's questions because the last issue is whether the defense has been persuasive in making an illegal argument or persuasive in saying that there's an illegal challenge is a factual decision or a fact-based question for the district court. And we submit on that finding. So you're saying that you looked at the inventory of the veneer and you thought you could get a better juror than this one gentleman? Yes, Your Honor, the one gentleman, yes, as we went through it. Someone that didn't have issues perhaps that may have been unpleasant through the verses in the courtroom or unpleasant with the lawyers generally, since, of course, we had the burden. And if they don't like what we present, what the government presents, because they had unpleasant experiences with the law, they're just not going to follow the instructions, or they will follow the instructions, and then they'll hold it against us. Not be convinced of the interests of the bill. I've never heard of an argument like that. No, it was the way we tried it. It was the way we saw the jury panel, as it was a rate that I can only present to the court. There was a, as the district court, a lower court found, a multi-ethnic, there was diversity in the panel. Another question that hasn't been talked about is whether a mistake was made in stating that somebody was a manager or a leader and Judge Mulway seemed to look at the facts somewhat. There was an issue, I guess, as to Douglas Tillman Sr. being a leader, Your Honor. I think it was also Douglas Tillman Jr. that was also found as a leadership role. For that matter, were you? Yes, all three, Your Honor, were found to have a leadership role. And an increase in the guideline sentencing range based upon a leadership role. I submit that the evidence that, if I recall, as Douglas Tillman Sr., there was testimony by his son that the chicken fight operation was, well, it sure was a chicken fight operation. He got a bigger share of the profits, and that was used as one of the concerns or factors that Judge Mulway found, the district court judge found. My understanding is that you're supposed to have supervised a certain number of people in order to be a leader or a manager. Yes. That seems, here they're all kind of equals. Maybe you can have... Now, there were people in the criminal enterprise underneath these good gentlemen, of course. There were about five other employees involved in the illegal gambling business. Mr. Seguido was in the illegal gambling business. He mentioned at one point that he took direction or had to check with Douglas Tillman Sr. before he would allow people into the room. Douglas Tillman Sr. was present in the cockfighting pit, and in order to, people would ask to come in to see the fight closer, and he would check with Douglas Tillman. He would get permission from Douglas Tillman Sr. to allow them in. But there were a number of people, other than the three gentlemen, that did work there in the illegal gambling business, a number of people that helped set it up. There was a referee, various referees at different times. There was the people that ran the gate, which was Mr. Seguido. The fighters would line up in the gate, and he would... He was all put into evidence to show the leadership role? It was argued by me that he had some supervisory position, if I remember correctly, Your Honor, at the sentencing. But I do remember the court did talk, the district court did find that the factor that he shared a larger percentage of the proceeds than others at the facility. In fact, all three Gilmans, well, four Gilmans if you include Charles Gilman, shared the revenue from the chairs. Of course, they wouldn't let us see. They would rent the chairs out for $10 a day, and that accumulated to about $4,500. The Charles Gilman, Douglas Tillman Sr., Douglas Tillman Jr. would all get $1,000. Nietzsche to Reitman would get $1,000, and William Gilman would get $500. None of the other employees shared in that. None of the other employees were there. William seems to stick out there, and that's it. It's hard for you to keep all this to your head, I understand that, but what evidence is there that William Gilman supervised other people? There was evidence that when he ran the, excuse me, when he worked at the Dice facility, he had a responsibility with his brother, Douglas Gilman Jr., for running that. He was described as the stick man. Yes, but that doesn't necessarily involve supervision of anybody. There was a box man, other than Douglas Gilman Jr. on occasion, that the stick man would have some supervision over, in my understanding, but that's one person rather than several. The court also was concerned or found an important fact that he was able to determine his method of payment. See, that's one of the things that gave me pause, because his method of payment gives him less. He decides he doesn't want to be paid. In effect, as a partner, he's getting paid as the money is being made. He's not waiting for the end for the share of the profit. He got the partnership payment from the chairs, and he wanted to get paid per day, because some days they didn't have a large stake. So it wasn't a big interest, apparently, and wanted to get paid per day, straight time, rather than percentage. That makes it a little hard, because if one of the things that makes somebody a supervisor or a manager is that he's collecting a share of the profits, and with respect to Douglas Sr., you indicated a larger share. Somebody that doesn't get a share of the profits, you become a manager, a supervisor, have more power. So either way, that seems to cite the person as being somebody with supervisory or managerial authority. I can only present what the court found. The court seemed to rely somewhat on the relationship of these people to customers. That's clearly not relevant. I didn't think necessarily customers, but other employees, too, Your Honor. Well, I don't have the citation to the record where I found that, but it seemed like an inappropriate approach to be saying that they had more relations to customers. I would agree with that. I'm not sure where the court's referring to that, but I would agree with that. That may be the stickman reference, because I read the reference, the stickman is saying, well, he's running the game, but it's not inherent to me, at least, that that necessarily means responsibility over somebody else that's working the game. Now, you indicated that stickman rules over boxman. That may be a piece that I'm missing from my personal knowledge, but is there something that supports that proposition? There was one day of testimony where the boxman was not Douglas Gilman, Jr., who actually gave some direction to William Gilman on occasion. There was a boxman that worked there one day, and William would have had control over him because he was a non-family member, and it was just sort of standing in because Douglas Gilman, Jr. was not there that day, if I remember the argument that was made or the testimony of the day, but I don't have any more to present on that, Your Honor, in that capacity. How does that add up to leadership? The court just, I can only tell you what the court found that there was. You had argued it. It's your evidence. It's your evidence. It was. And I argued that because some person did have some control over a larger percentage of the take at the house, although it was not necessarily the fees raised by the Gilman, but they were the fees raised by selling chairs, where the other employees didn't get that. It was the Gilman's. Why does that make you a leader? I mean, he's part of this family. So maybe his father, who was in his 80s, wants to reduce his estate for estate tax purposes. So he gives him $500. That's what they do sometimes. I can only reiterate what the court considered and how the court ruled as to the amount of money. I'm not interested in what you argue. I certainly don't have a problem with that finding. It's one of the factors listed in the considerations of the sentencing guidelines, one of the factors that a court may be involved with. There can be more than one leader, of course, in a criminal enterprise. There is testimony that there were about eight separate employees that would come in, cut the grass, set up the tents, clean it up, and they would pay largely with drugs rather than... So if you're in a house and you have five people come in to clean the place, you're a Gilman, you're a leader. Well, the Gilman's had authority over this illegal gambling business, and there were employees of the illegal gambling business that didn't share in the percentage of the receipts that these Gilmans did, Your Honor, including William, including Douglas Junior, including Mr. Schreiber, although her share was larger than William's. But that was one factor listed in the sentencing guidelines that the court may consider in determining a leadership role, and the court found it. We believe that's a correct view or interpretation of the guidelines, and that was one of the factors that was presented in the pre-sentence report for his leadership role. I see I have a question about the first defendant here. Mike or Mr. Rodman? The court had questions on her statements. What was her sentence? I won't say 24 months. It may have been 30, Judge. No, 24, you're right, 24. And she had two little kids, two babies. She had three, Your Honor. She had three. One was an older teenager. And what was her role here? She was a founder with Charles Gilman when they went back and set up the ring in the cockfighting enterprise. And then the father came back and joined with them in the, where they set up, they first called it the cooper. And she was head of what she called a blood pact with Charles Gilman, that they would share the proceeds. There was testimony as well that she went down one day in the ring and said this fight is over, it would stop it. Although there was apparently bad feelings between her and Charles Gilman. They had sort of a falling out, whereas they had been good friends prior to that. But she continued to, she and her husband, Defendant Green, boyfriend, girlfriend at that time, I believe, continued to share in the profits of the enterprise. There was pretty much weekly payments were made to them. She received some of the payments. Three of the times Mr. Broom, the testimony was that three of the times Mr. Broom was there during the payments in Counts 5-8. One time Mr. Broom received the payment directly to himself in the store, according to Mr. Seguido. But she was part of the illegal gambling business, set aside by the jury in part of a conspiracy. Then she was acquitted of, I believe, Count 4, which is a conspiracy on the Hobbs Act, but was convicted of the four separate Hobbs violations, 5, 6, 7, and 8, and then convicted of the illegal gambling business, the conspiracy to commit the illegal gambling business, Counts 1 and 2, and then Count 3, the obstruction of the state gambling laws, obstruction of justice in obstructing... She actually has, let's see when it's all over with, she has 18 years of supervised release. 18 years of supervision? I don't think so. Not 18 years, Judge. I have 24 months on 6 counts, plus 3 years supervised release. Oh, concurrence. They're concurrence. Oh, they're concurrence. That's right. Yeah. All right. Yeah. Unless the court has more questions, I'll submit. When did they start living together, these two? They've been together before they lived in the Wahegaw area. They had a home, a condo, I believe, in Pearl City. They've been together a number of years. And the children are there, Your Honor. Children are there. Yes, but when she started working with Charles, 2002 or 2003, they were living as husband and wife. No, they were not married as husband and wife, I believe,  But they started to live as husband and wife. Living in a household. Yes. Living in a household. Yes, Your Honor, I think so. I believe that's correct. And all the children are his? I believe that's correct, Your Honor. Okay. Thank you. Thank you. Any rebuttals? Yes. If I may, just shortly. Your Honor, just my chair, with respect to William Drummond, I believe that the trial court inappropriately gave him an upward adjustment because I really believe that there was really no evidence of him single-parenting anyone. Okay.  Thank you. Thank you very much, Your Honor. Thank you. With respect to the vaccine issue, Terry Broom at trial specifically referenced two jurors being Filipino ancestry and also referenced the court being himself being such. Are these two jurors remain on the jury or were split? No, they were split by the government, one of whom, Josephine Arlanticold, who the government basically said they couldn't understand her, I think is what the argument was. She had college education. She had been a supervisor of the State Department of Health. She's also the one who identified herself as a federal employee, only she wasn't. She worked for DAIC. Yes. Well, she did work for the State DAIC. That was not the reason the government, if anything, articulated her, basically couldn't understand her, but she worked in a supermarket position and had been employed by the state for 28 years and had attended college, and that was the second bump after the earlier gentleman, a Filipino ancestry, who was also bumped and he had raised that this was clearly a race-based pattern. Did she say she was a federal employee? I don't recall that. It's in the record. I don't recall that. The other one, just very briefly. Did you make a transcript? I did. I don't recall her specifically saying that.  But I think, nonetheless, that if in fact that was said, that that is not the issue that was articulated by the government as for the reason why it bumped her. But there was a problem understanding her English. I don't believe there was. I was there during the process as well. I beg to differ with the government on that point. The other issue, two other points, if I may. One is the unanimity instruction and the instruction on comments one and two, I believe. Should that instruction be found to be deficient in this case? We would also submit that on comment three, the obstruction charge, that is an element of that charge as well, and that that should be a basis for a reversal on comment three with respect to Mr. Bloom because that element needs to be found with respect to the obstruction charge. And the last issue that was raised by Mr. Mule was an issue of us having access. There was a statement made by myself at opening arguments that Sgt. Bloom had introduced John Sobibor to an officer named Brown, who was in another unit, the criminal intelligence unit. That really was the extent of it all. And we also believe that Sgt. Bloom was deprived of brilliant, I can give you the material that should have been provided earlier as well, with respect especially to impeachment that may have been. Thank you. Can I just make one point? It's not an argument, it's just a procedural point. I want it to be clear. All three co-defendants, Mr. Keregna, Kevin Bloom, and Charles Gilman Sr. were allowed by order of this court to join in the arguments made by and raised by Mr. Hulloody and his briefs. We respect that that's in the discovery issue. We have that. We need the order. So we're all in.  Anything else? No. All right. This matter is submitted and the court will recess until 9 a.m. tomorrow morning. Thank you very much for your arguments. All right.
judges: Fletcher B. , Pregerson, Clifton